In the Interest of Y.M.H., Minor.

Tom HOOVER, Juvenile
Officer, Respondent,

v.

Y.M.H. (Natural Mother), Appellant.

No. WD 43816.

Missouri Court of Appeals,
Western District.

Oct. 22, 1991.

Elizabeth Stitt, Legal Aid of Western Missouri, St. Joseph, for appellant.

James G. Spencer, Sullivan County Prosecuting Atty., Milan, for respondent.

Before FENNER, P.J., and LOWENSTEIN and ULRICH, JJ.

ULRICH, Judge.

Y.M.H. (mother) seeks a reversal of the trial court's judgment terminating her parental rights in her minor daughter, Y.M.H.[1] On appeal, the mother contends that the trial court erred in determining that she abandoned Y.M.H. pursuant to § 211.447, RSMo 1990. The trial court's judgment is affirmed.

The mother contends on appeal[2] that the trial court erred by terminating her parental rights to Y.M.H. because (I) there was no clear, cogent, and convincing evidence to prove that one or more of the statutory grounds for termination of her parental rights, as required by § 211.447, were present; (II) there was no clear, cogent, and convincing evidence to prove that the Sullivan County Division of Family Services had used reasonable efforts to provide services to the mother in an effort to reunite the child with the mother; (III) the mother proved she had repented for any prior abandonment; and (IV) the trial court's finding that the termination of the mother's parental rights is in the best interest of Y.M.H. is not based on clear and convincing evidence, and is against the weight of the evidence.

Y.M.H. was born on June 8, 1987, at Boone County Hospital, Columbia, Missouri.[3] Y.M.H., her mother and her father, A.L.H.,[4] were living in North Carolina when the Department of Social Services (DSS) became involved. DSS received complaints on May 17, 1988, that Y.M.H. was being neglected and abused. The reports included information that Y.M.H. was being fed alcoholic beverages, alcohol abusers and criminals were caring for and residing with Y.M.H., the family had no stable source of income, and the mother was being assaulted by A.L.H. DSS provided child protective services as a result of these complaints. Subsequently, the mother and Y.M.H. returned to Green Castle, Missouri, in August of 1988, to the home of the maternal grandmother and M.T., Y.M.H.'s great aunt.

In September 1988, the mother returned to North Carolina for approximately three weeks. During this time, the great aunt, M.T., took care of, and supported, Y.M.H. In fact, M.T. has provided the primary support and care for Y.M.H. since she was brought back to Missouri. The mother married Clarence Powell on October 10, 1988, shortly after returning to Missouri.

1. The mother shares the same initials as her daughter, consequently, hereafter, only the daughter will be referred to as Y.M.H.

2. The father, A.L.H., does not appeal the termination of his parental rights.

3. Y.M.H. is the mother's fifth child. Y.M.H. does not share the same biological father with any of the other children. Three of the children have been placed with their natural father. The fourth child was given up for adoption shortly after birth. The mother has had virtually no contact with these four children for the past several years.

4. The mother and A.L.H. were never married.

Throughout this marriage, M.T. continued to provide the majority of care for Y.M.H. Y.M.H. would stay in a mobile home with M.T., M.T.'s mother, and M.T.'s brother, while the mother and Mr. Powell occupied a house situated on the same property as the mobile home. This arrangement continued from August 1988 to March 1989, with the mother spending very little time with Y.M.H.

In March of 1989, the mother continued her nomadic lifestyle, this time she attended a truck driving school somewhere near Kansas City, Missouri. She was to have been gone for only two weeks, but M.T. did not hear from the mother until the latter part of April 1989. The mother called and said she was on a truck leaving for Mobile, Alabama. However, the mother failed to arrange any permanent plans for taking care of Y.M.H. She simply left Y.M.H. with M.T. From the time the mother left in March until mid-May 1989, the mother contacted M.T. and Y.M.H. with a few, short telephone calls and a letter.

The mother did not see Y.M.H. until May 1989 when she took her daughter to Camp Lake Westside in Bourbon, Missouri, where she had been living and working. At the end of May, M.T. received a telephone call from the mother's employer, who expressed concern about Y.M.H. The mother and Y.M.H. had not been seen for a period of time. Despite several attempts, M.T. was unable to locate either the mother or Y.M.H. from mid-May until August 1989. On August 15, 1989, M.T. received a telephone call, around midnight, from a Mr. Brust in Steelville, Missouri, informing her that the mother was in jail for passing bad checks. M.T. was able to contact a sheriff's deputy in Steelville, who told her of the situation and arranged for M.T. to obtain Y.M.H. the next morning. Steelville is about a five-hour drive from Green Castle.

M.T. was able to get Y.M.H. in Steelville the next day. M.T. conversed with the mother; however, the mother did not make any arrangements with M.T. for the continuing support and care of Y.M.H. A few days later, the mother called M.T. to inform her that she had been released from jail.

Again, the mother never discussed the care or well-being of Y.M.H., nor did she make any provision for the support and care of Y.M.H. M.T. contacted the Sullivan County Division of Family Services (DFS), believing Y.M.H.'s well-being was in jeopardy. The Juvenile Officer filed a report with the Sullivan County juvenile court, and an order was entered by that court on August 15, 1989. The court received the report which stated that Y.M.H. was suffering from lack of proper care and neglect and was in need of immediate treatment. The court, based upon the report, placed custody of Y.M.H. with M.T. under the supervision of DFS.

A hearing to determine if the court had jurisdiction over Y.M.H. was set for August 28, but the mother could not be located. Both the mother and father of Y.M.H. appeared for the September 6th hearing, but neither the father nor Y.M.H. had legal counsel present. The court granted a continuance, allowing them time to retain attorneys. At the next hearing, on November 1, all parties were present except the mother. The court rescheduled the matter for November 21, 1989. Again, the mother failed to appear at the November 21st hearing. The court, nonetheless, proceeded with the hearing to determine whether the court had proper jurisdiction over the juvenile. After hearing the testimony of several witnesses, the court found that Y.M.H. had been neglected by both parents. The court further found that both of the child's parents failed to provide care and support for Y.M.H. The court recognized that but for M.T., Y.M.H. would have had no one to care for her. Additionally, the trial court determined that DFS could not have reasonably prevented the removal of Y.M.H. from her parent's home. The court accordingly found that it had jurisdiction over Y.M.H. and made her a ward of the court, thereby transferring the child's custody to DFS for temporary placement in M.T.'s home.

A hearing was held on March 13, 1990, to determine if Y.M.H. should remain a ward of the court. Even though the mother was notified of the proceeding, she again was not in attendance. After hearing the evi-

dence presented, the trial court found that Y.M.H. continued to be in need of care and supervision, which were not being provided to her by her parents. The court ordered Y.M.H. to remain in the home of M.T., under the supervision of the court and DFS. The court recognized that DFS had made reasonable efforts to return the child to her home. However, DFS received no cooperation from the parents. The court, therefore, ordered the Juvenile Officer to file a petition for termination of parental rights, to be heard on May 16, 1990.

The mother attended the May 16th hearing. However, she did not have legal representation, although it was made available to her. The court granted yet another continuance, rescheduling the termination hearing for June 14, 1990.

Finally, on June 14, the court was able to proceed with the termination hearing. The court received substantial evidence and listened to the testimony of numerous witnesses. The court received additional evidence on July 3, 1990. After taking the case under advisement, the court, on August 3, 1990, terminated the parental rights of both the mother and father. The court found clear, cogent, and convincing evidence was presented that the father had abandoned Y.M.H., pursuant to § 211.447. The court determined that the father had no contact with, and provided no support to, his daughter from September 7, 1989, to June 14, 1990. The court found that the best interests of Y.M.H. required that the father's parental rights be terminated.

The court found that the mother also had abandoned Y.M.H. by leaving her without good cause, and by failing to provide for Y.M.H.'s support and care. § 211.447. The court noted that between August 15, 1989, and July 3, 1990, the mother had visited with the child for only approximately ten hours and had provided only $33.00 in support. The evidence disclosed that the mother was working during this time period and had the means and ability to visit Y.M.H. The court further determined that during June 14 to July 3, 1990, the period in which the termination hearings occurred, the mother failed to demonstrate any de-

sire or willingness to repent or make an effort to establish a relationship with Y.M.H. The court found that DFS had made reasonable efforts to provide services to the mother, but she failed to take advantage of these services and, instead, made herself wholly unavailable and disinterested in the well-being of her child. The court found that DFS had provided services for Y.M.H., including counseling, supervision, support, and home studies of her relatives. The court, therefore, found it to be in the best interests of Y.M.H. to terminate her mother's parental rights.

The trial court's decision will be affirmed unless there is no substantial evidence in the record to support it, the decision is against the weight of the evidence, or the trial court erroneously declares or misapplies the law. *In the Interest of M.L.W.*, 788 S.W.2d 759, 762 (Mo.App.1990) (citing *D.G.N. v. S.M.*, 691 S.W.2d 909, 912 (Mo. banc 1985)). This court will review the trial court's decision by viewing the evidence, and all reasonable inferences from such evidence, in the light most favorable to the decision. *In Interest of M.L.K.*, 804 S.W.2d 398, 400 (Mo.App.1991). The primary concern of the court in any parental rights termination is the best interest of the child. *In Interest of M.L.W.*, 788 S.W.2d at 762. There must be clear, cogent, and convincing evidence that a violation of one or more of the statutory grounds prescribed by § 211.447 are present in order to terminate a parent's rights. *In Interest of D.O.*, 806 S.W.2d 162, 166 (Mo.App.1991). This court will give due deference to the trial court's ability to determine the credibility of witnesses. *Id.*

I

The mother contends, for her first point on appeal, that the record is devoid of clear, cogent, and convincing evidence to prove that one or more of the grounds for terminating parental rights specified by § 211.447 existed. The existence of one of these grounds is necessary to terminate the mother's parental rights. *Id.* The mother also argues that her relationship with

Y.M.H. is substantial enough to preclude the determination that she abandoned her daughter.

The Missouri legislature has expressed guidance to the courts in determining whether parental rights should be terminated. *See* § 211.447.2–.447.4. In addition to the specified grounds that must be proven by clear, cogent, and convincing evidence before a parent's rights are terminated, the legislature has also prescribed that "[t]he court may attach little or no weight to infrequent visitations, communications, or contributions." § 211.447.4, RSMo 1990.

■ The record discloses that the mother had minimal contact with her daughter from the time M.T. acquired physical custody of Y.M.H. at the Steelville jail in mid-August 1989, until the June 14, 1990, termination hearing. From the time the court initially became concerned in Y.M.H.'s well-being, August 15, 1989, until the trial court issued its decree, the mother spent approximately ten hours with her daughter and contributed only $33.00 for her support, despite the mother's ability to visit more frequently and to provide more support for her daughter.

After hearing and weighing all the relevant evidence, the trial court determined that the mother's nominal visitation with Y.M.H., and the minuscule monetary support paid to M.T. by the mother for her daughter's support, were mere token efforts. While living in Green Castle with her new husband, Clarence Powell, the mother ignored Y.M.H. The great aunt, M.T., provided most of the care and support for Y.M.H. After the mother began her nomadic lifestyle, she infrequently called or informed M.T. where she was. When the mother did visit, her visits were very brief. When two visitation periods were scheduled for consecutive weekends preceding the June 14, 1990, termination hearing, the mother visited her daughter for part of one day during the first weekend, and did not even appear at the second visitation weekend. The record clearly demonstrates that any efforts made by the mother were token. The trial court proper-

ly attached little or no weight to such infrequent visitations and contributions. § 211.447.4.

Other Missouri courts have also recognized infrequent visitations as token and inadequate efforts. The court in *In Interest of M.L.W.*, 788 S.W.2d at 760, affirmed the termination of parental rights when facts very similar to facts in this case were presented. In *M.L.W.*, the mother lived a nomadic lifestyle, never establishing a stable home. *Id.* at 762. The mother in *M.L.W.* also attended a truck driving training school in another area of the state, and moved from area to area without giving notice of her whereabouts. *Id.* at 762. The court recognized that the mother "chose to be an infrequent visitor in the life of her daughter, leaving her to attend a truck driving training school and moving from county to county. . . ." *Id.* The mother's nomadic lifestyle, as well as the token visits and support given to the child, evinced the mother's lack of commitment and interest in her child. *Id.* The court in *M.L.W.* determined there was clear, cogent, and convincing evidence to support the trial court's termination of the mother's parental rights. *Id.*

The court in *In Interest of M.L.K.* also attached little or no weight to a mother's infrequent visitations or communications, pursuant to § 211.447.4. 804 S.W.2d at 403 The court in *M.L.K.* stated that "[p]arents are not allowed to maintain only a superficial or tenuous relationship with their children in order to avoid a determination of abandonment. Rather, the courts may regard such efforts as token and terminate parental rights despite their existence." *Id.* (citations omitted). The mother in *M.L.K.* provided no support for her child, sent infrequent letters, and rarely visited her child. *Id.* The trial court's termination of the mother's parental rights was affirmed. *Id.*

The law in Missouri and the facts in the present appeal are determinative of the trial court's finding that the mother abandoned Y.M.H. The mother's infrequent visitations, communications, and nominal support payments for her daughter were

properly given little or no weight by the trial court.

■ The mother also argues that she did not abandon her child because she left Y.M.H. in the custody of a loving relative, M.T., who provided care for Y.M.H.

The court in *J.H.H. v. J.D.*, 662 S.W.2d 893, 896 (Mo.App.1983), addressed the argument that leaving a child with a relative does not constitute abandonment. The court recognized "that 'where there is good cause because of a temporary situation a parent may leave a child in the custody of a third party without abandoning the child.' " *Id.* (quoting *H.D. v. E.D.*, 629 S.W.2d 655, 658 (Mo.App.1982)). However, the court in *J.H.H. v. J.D.* stated:

There was no "temporary situation" here. As we noted earlier, the understanding of all involved was that [the child's] living at the aunt's and uncle's home was a permanent arrangement. Here, as in *H.D. v. E.D.*, the caretaker's gratuitous promise to the mother to care for her child indefinitely is best seen as token support by the mother which the court properly ignored. *Id.* at 658. The juvenile court also properly found the mother's sporadic communications with [the child] to be, at best, mere token efforts to preserve the parent-child relationship. In short, the record is replete with substantial evidence to support the juvenile court's finding that, for a period of at least six months, the mother had left [the child] without any provision for support and without any communication or visitation and had therefore abandoned him.

*Id. See also In Interest of Kevin*, 685 S.W.2d 938, 941–42 (Mo.App.1985). Similarly, in the present appeal, the mother left Y.M.H. with no provision for support, and she did not communicate with or visit her daughter. The record convincingly manifests the mother's intent that the arrangement was not temporary since the predicament lasted from mid-August 1988 until the termination hearing on June 14, 1990.[5] The mother's relinquishment of Y.M.H.'s

physical custody with M.T. and her perpetual absence from Y.M.H., coupled with her infrequent visitations, sporadic communications, and nominal support payments, demonstrate the mother's abandonment of Y.M.H.

■ The mother also contends that she is bonded to her daughter and that this should be considered. The trial court recognized that the child has some emotional ties to her mother. However, this argument is not persuasive. A mother's lack of interest and commitment to a child who is bonded with the mother is considered more egregious than an abandonment of a child who is not emotionally bonded to the parent. *In Interest of C.M.W.*, 813 S.W.2d 331 (Mo.App.1991).

The trial court found that the mother had abandoned her daughter for a period of six months or longer. The mother left the child without good cause and without any provision for support or visitation. The trial court found that Y.M.H. was neglected by her mother's continuous failure to provide her care and support although able to do so both physically and financially. The record demonstrates substantial, competent evidence to support the trial court's determination that one or more of the factors enumerated in § 211.447 were proven by clear, cogent, and convincing evidence, thereby justifying the termination of the mother's parental rights. The mother's first point is denied.

## II

■ The mother next contends that the record is devoid of clear, cogent, and convincing evidence proving the Sullivan County Division of Family Services used reasonable efforts to provide services to reunite the child with the mother. The mother contends that DFS was at fault for the mother not obtaining all services offered. However, the record demonstrates that the mother was unavailable, uncooperative, and disinterested in receiving any services offered by DFS.

---

**5.** This court notes that M.T. provided the primary care for Y.M.H. since the child arrived in

Missouri in August 1988, except for the brief period of time between May and August 1989.

Habitually, the mother was unavailable. The mother seldomly informed anyone of her location or how she could be contacted. For lengthy periods of time, M.T. was unable to locate the mother. Rhonda Fry, a DFS employee, made attempts to contact the mother but was unable to do so. A Juvenile Officer also made numerous, unsuccessful, attempts to locate the mother.

In addition to being voluntarily unavailable to receive any services DFS offered, the mother did not initiate any efforts to attain these services. The mother was informed of services available from agencies such as DFS. When the mother was in North Carolina, she received services such as counseling, housing assistance, and food stamps. The mother testified that when she came to Missouri from North Carolina she was aware that these services were available. She also was sent the docket entry for the November 21, 1989, hearing, which included a reference that DFS offered services. That the mother knew DFS provided services that could assist her situation is evident. Ms. Fry testified, upon questioning by the trial judge, that the mother did not inquire as to visitation programs, counseling, parenting aid, or any other specific programs that could benefit her parent-child relationship. The mother chose not to utilize the services provided by DFS.

DFS provided the child with a number of services. DFS arranged counseling for Y.M.H., supervision and support for the child, and obtained home studies regarding the mother, the child's aunt and uncle in Oklahoma, and M.T. DFS frequently contacted the child and M.T. DFS arranged visitation between the mother and Y.M.H. for two consecutive weekends. However, the mother spent only part of Saturday of the first weekend with her daughter, and did not visit her daughter on the second visitation weekend. The record reflects that DFS used reasonable efforts to provide services to the mother; the mother, instead, chose not to use the services and to be uncooperative.

Section 211.447.2(3)(a) "requires an affirmative duty on the part of a parent to support, communicate and visit the children and to show that the parent is committed to the child by showing an interest." *In Interest of A.L.B.*, 743 S.W.2d 875, 881 (Mo. App.1987). *See also In Interest of M.L.W.*, 788 S.W.2d at 763. DFS "is not required to initiate visits or maintain contact between children and the parent. Visitation or contact which does not originate with a true desire of a parent amounts to only a 'superficial and tenuous relationship.'" *Id.* (quoting *In Interest of R.E.M.*, 712 S.W.2d 398, 403 (Mo.App.1986)). Furthermore, this court has decided that "[a]lthough the effort of DFS to reunify the parent and child is a factor to be considered, 'even the absence of treatment or services is no defense to a termination proceeding.'" *In Interest of J.M.*, 815 S.W.2d 97 (Mo.App. 1991) (quoting *In Interest of A.L.B.*, 743 S.W.2d at 881). The record is replete with evidence that the mother did not have the desire to initiate support, visitation, or communication with Y.M.H. The efforts taken by the mother were token.

The mother cites *In Interest of A.L.W.*, 773 S.W.2d 129 (Mo.App.1989), to support her argument that her parental rights should not be terminated because DFS failed to provide her available services to reunite her with her daughter. The mother's reliance upon this case is misplaced. The court in *A.L.W.* ruled on whether four children should be made wards of the court. *Id.* at 131. The court of appeals found that the trial court's order of disposition was deficient pursuant to § 211.181, RSMo 1988, and there was no substantial evidence that DFS had used reasonable efforts to reunite mother with children. *Id.* at 133–35.[6] *Id.* However, the court's order in the present appeal states that DFS used reasonable diligence in providing services to reunite mother and daughter. The order also specifies those services provided to the juvenile and the reason why other services were not provided to the mother. Unlike *A.L.W.*, the mother in this appeal was unavailable. She absented herself,

---

**6.** The mother in the appeal sub judice does not     contend that the trial court's order is deficient.

provided no information to facilitate contact with her, and did not herself maintain contact with DFS. The trial court determined that the mother made herself unavailable and was uncooperative with DFS. The mother did not avail herself of any services.

The trial court properly found that "[t]he mother has displayed disinterest and lack of commitment to her daughter and has not made herself available to receive any services offered by the Division of Family Services calculated to reunite the child with her mother in a stable home environment." The trial court further decided that "[t]he Division of Family Services has made reasonable effort to provide services to the parents of this juvenile in an effort to reunite the child with her mother and father." This determination is supported by substantial evidence, is not against the weight of the evidence, and does not erroneously declare or misapply the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Point (II) is denied.

### III

■ The mother argues for her third point on appeal that the trial court erred in terminating her parental rights because she is repentant of any prior abandonment. A parent may terminate an abandonment if the parent has repented for the abandonment. *In Interest of M.L.K.*, 804 S.W.2d at 403. The court in *In Interest of M.L.K.* said:

"Repentance of the abandonment may be determined by the actual or attempted exercise of parental rights and performance of parental duties following the abandonment." However, whether there has been a repentance requires an examination of the parent's intent, an inferred fact, determined by considering all the evidence of the parent's conduct. Not every gesture by a natural parent will repent an abandonment.

*Id.* (quoting *In Interest of T.H.*, 497 S.W.2d 210, 212 (Mo.App.1973)) (citations omitted).

■ The mother's actions in this case demonstrate a lack of intent to repent. The mother spent approximately ten hours

with her daughter and provided only $33.00 for her daughter's support since the court first took interest in the child's well-being, a period spanning over ten months. The indifference displayed by the mother towards her daughter's well-being does not demonstrate repentance for abandonment. Instead, the record reflects that the mother has not repented for her abandoning Y.M.H. The mother's third point is denied.

### IV

The mother's final point on appeal contends that Y.M.H.'s best interests are not served by terminating the mother's parental rights. The mother argues that there is no clear, cogent, and convincing evidence to support such a determination.

■ The trial court properly found, fully supported by the record, that the mother abandoned and neglected her daughter, made herself unavailable to receive services from DFS, and was unrepentant for the abandonment. The trial court determined that the best interest of Y.M.H. required termination of her mother's parental rights.

Y.M.H. has suffered because her mother is disinterested and wholly uncommitted to her daughter's future and well-being. However, Y.M.H. is fortunate to have other family members who love her and aid her. Her great aunt, M.T., has provided the support, care, and affection that the little girl's mother did not provide. Additionally, Y.M.H.'s aunt and uncle have expressed a desire to care for her. Both of these parties are actively pursuing the adoption of Y.M.H. Thus, based upon the mother's abandonment and neglect of Y.M.H., as well as the other family members' expressed willingness to provide a stable home to Y.M.H., there is substantial and competent evidence to support the trial court's finding that it is in the best interest of Y.M.H. to terminate the mother's parental rights. Therefore, the mother's final point is denied.

■ The mother's court appointed attorney filed a motion on appeal for an award of attorneys fees for work per-

formed in perfecting the appeal. A court appointed attorney in a parental rights termination action should be awarded attorney fees for services rendered to perfect the appeal. *In Interest of M.V.*, 775 S.W.2d 262, 265 (Mo.App.1989); *see also K.S. v. Division of Family Services*, 722 S.W.2d 364, 365 (Mo.App.1987). The allowance of attorney fees for the attorneys who are appointed for either the child or parent is made pursuant to § 211.462.4, RSMo 1986. This section states that "[c]ourt costs shall be paid by the county in which the proceeding is instituted, except that the court may require the agency or person having or receiving legal or actual custody to pay the costs." § 211.462.4. Attorney fees, both for trial and appellate work, may be taxed as part of § 211.462.4's "court costs" against either a private party or agency, a state agency such as the Division of Family Services (DFS), or the county. *M.V.*, 775 S.W.2d 262; *K.S.*, 722 S.W.2d 364.

In this case, the trial court ordered DFS to pay the attorney fees for services rendered in representing the mother throughout the termination hearings. The court presumably required DFS to pay the fees because DFS had "legal or actual custody" of Y.M.H. § 211.462.4. Accordingly, "it would appear that the trial court's decision as to where the burden of costs falls is final and not subject to review." *M.V.*, 775 S.W.2d at 264 n. 2. Since the trial court denominated DFS as the party to pay attorney fees, DFS is the proper party to pay for the attorney fees for the appeal.

■ The appellant requests $4,691.00 ($75.00 × 62.55 hours) for her services rendered on the appeal. The amount that the court awards for attorney fees is discretionary with the court. "Courts are themselves experts on the subject of attorney fees and this expertise extends to the value of appellate services." *Trapani v. Trapani*, 686 S.W.2d 877, 878 (Mo.App. 1985). Therefore, the amount awarded as attorney fees is within the court's discretion.

The judgment of the trial court terminating the mother's parental rights is af-

firmed. The appellant's motion for attorney fees for perfecting the appeal is remanded to the trial court.

All concur.